UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14068-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

BRITTANY LYN DURKIN,
    Defendant.
_____/

**DEFENDANT'S POSITION PAPER ON SENTENCING AND REQUEST FOR A DOWNWARD VARIANCE**

COMES NOW defendant, Brittany L. Durkin, by and through her appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

**SENTENCING POSITION PAPER**

I. **The Offense Circumstances**

On July 18, 2022, the Sebastian Police Department (SPD) received a Treasure Coast Crime Stopper complaint stating that Christopher Bauer, Ms. Durkin's co-defendant, was receiving two ounces per week of fentanyl, from a source of supply from the dark web, that he was then distributing in the community. According to the tip, the fentanyl was shipped from California to 317 Sea Grape, Sebastian, Florida to Brittany Barber, who was Ms. Durkin, and 317 Sea Grape was her grandmother's residence.

SPD Detective Melius contacted the United States Postal inspectors who provided historical database results of express packages that were delivered to Ms. Durkin's address. Ms. Durkin, at the request of Mr. Bauer, requested that the packages be held at the post office and that she be contacted when they arrive, leaving her contact information. On August 31, 2022, the postal inspectors contacted Det. Melius and informed him that a package had arrived for Ms. Barber (Ms. Durkin). Law enforcement set up surveillance at the post office and observed a red Cadillac, being driven by Mr. Bauer with Ms. Durkin in the passenger seat, arrive at the post office.

Ms. Durkin exited the vehicle, entered the post office, and eventually exited the post office with the package and reentered the Cadillac. Before exiting the post office, Mr. Bauer stopped next to a white GMC pickup truck and Ms. Durkin exited the vehicle and received clean urine from the person in the truck for a drug test that she was scheduled to take later that day. Ms. Durkin returned to the red Cadillac and Mr. Bauer then proceeded to exit the post office. When SPD attempted to stop the vehicle, Mr. Bauer refused to stop the car and proceeded to take the police on a high-speed chase. Ultimately the vehicle was disabled by law enforcement and Mr. Bauer and Ms. Durkin were detained. Ms. Durkin gave the police a statement after being detained and was eventually released.

Ms. Durkin was arrested on November 4, 2022, and released on a personal surety bond. Ms. Durkin has remained at liberty during the duration of this matter and has complied with all of her bond requirements, she has secured employment, she has continued with substance abuse counseling and mental health counseling.

**II.      Position as to Sentencing**

   *A.      Ms. Durkin's Personal Circumstances*

As Ms. Durkin finds herself before this Honorable Court, she continues to ask herself, "exactly how did I get here?" And, quite frankly, everyone else in Ms. Durkin's life continues to ask the same question, "how did all of this happen?"

Ms. Durkin was born to the marital union of Ms. Martin Durkin and Mrs. Robyn Durkin on July 14, 1989, in Port Jefferson, New York. Ms. Durkin was raised in Port Jefferson, with her two brothers and grew up in a solidly middle-class family, her father is a retired NYPD detective and her mother retired medical office manager. (See draft PSR Pg. 14, ¶ 56). Ms. Durkin recalls growing up in Port Saint Lucie, "we were close enough to the city to go whenever we wanted to have some fun, but far enough to enjoy suburban life. My neighborhood was one in which we knew most, if not all, of our neighbors and if we left the door unlocked, we didn't have to worry much about people running into our home. My parents provided for me, and my siblings, and I didn't experience any abuse or trauma while growing up. I had a good childhood. My parents made sure that I had what I needed, and I never went to bed hungry. My parents worked hard and they expected us to go to school and be good kids."

In school, Ms. Durkin states that she was a 'decent' student' and she graduated with her high school diploma. After leaving high school, Ms. Durkin states that she completed training as a medical assistant and has worked as a medical assistant, working for a now defunct medical practice called 'Woman's Healthcare of Suffolk,

NY. Ms. Durkin also stated that she volunteered for a year as a volunteer firefighter for the Centereach Fire Department in Long Island, NY.

Ms. Durkin's life changed forever after she married her husband, Vincent Barber, in 2015. Her marriage to Mr. Barber turned out to be devastating for Ms. Durkin. She experienced verbal, physical, and sexual abuse at the hands of her husband. Her husband didn't maintain a job and ended up doing time for burglary and trafficking in stolen goods. According to Ms. Durkin, the best thing that happened in that marriage were her children, the son she had with Mr. Barber and the son she adopted and parented, even when his own father, Mr. Barber, decided he didn't want to be a father any longer.

1. *Application of § 3553(a)(2)*

It is "the stated purpose of sentencing, that the sentence be sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2). For Ms. Durkin this commandment justifies a sentence of probation, or in the alternative, a sentence of time served and a term of supervised release to include a year of house arrest.

Of the goals set out in 18 U.S.C. § 3553(a)(2), Ms. Durkin believes that a time sentence of probation will consider the need for the sentence to "reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense;" "afford adequate deterrence to criminal conduct;" "protect the public from further crimes of Ms. Durkin;" and "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2)A-D.

### a.  Ms. Durkin's Criminal History

When balancing the 3553(a) factors, the need to protect the public from further crimes of Ms. Durkin cuts most in favor of her request for a probationary sentence. The United States Sentencing Commissions Report on *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), Ms. Durkin's request for a probationary sentence.

The findings of the Sentencing Commission's report support the relationship between prior criminal record and recidivism, a relationship that has been recognized by the Commission since its inception in the mid-1980s.[1]  "… An offender's total criminal history points, which determines the CHC to which the offender is assigned for the purpose of calculating the sentencing range under the guidelines, is designed in part to reflect recidivism potential.  In order "to protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.  For example, 46.9 percent of offenders with one criminal history point were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points.  In fact, each additional criminal history point is generally associated with a greater likelihood of recidivism (See figure 6).[2]

---

[1] Recidivism Among Federal Offenders: A comprehensive Overview (Published March 2016), can be found at: www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at page 18.

[2] *Id.*

Figure 7A of the report shows the rearrest rates by criminal history category. Those in criminal history category I had the lowest rearrest rates, at 33.8 percent, as compared to those in criminal history category VI who had a rearrest rate of 80.1 percent.[3] The commission's report went on to find that "there was not a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism… Although the specific numerical offense severity determined under the sentencing guidelines appears to not be correlated with recidivism, the type of crime the offender committed does have some correlation with the risk of future crime. Offenders whose federal offense involved firearms were most likely to be rearrested (68.3%), followed by those arrested for robbery (67.3%), Immigration (55.7%), drug trafficking (49.9%), larceny (44.4%), other (42.0%), and fraud (34.2%) (See Figure 8).[4] Lastly, the report also found that those offenders who received an mitigating role adjustment under the guidelines were less likely to recidivate than most other offenders. Those receiving no adjustment had a rearrest rate of 49.7 percent as opposed to those who received a four-level mitigating role adjustment who had a rearrest rate of 43.6 or those with a three-level adjustment who had a 37.5 percent rate.[5]

Another commission report, *Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), Exhibit 9, provides this Court with further

---

[3] *Id.* at page 19.

[4] *Id.* at page 20.

[5] *Id.* at page 21, figure 9.

proof that a non-incarceration sentence is a sufficient sentence in this matter. Exhibit 9 shows that those offenders in CHC I who fall within the 31 to 35 age group have a recidivism rate of 14.6%, as compared to those, for example, in the 21 to 25 years of age bracket who recidivate at a rate of 22.3% and those under 21 who recidivate at a rate of 29.5%; the recidivism rate is even lower for women in CHC category I who recidivate at a rate of 10% and those who are white in CHC I who recidivate at a rate of just 8.9%.[6]

Exhibit 10 of the report goes on to further show some of the lowest rates of all those surveyed for the report among those who are similarly situated as Ms. Durkin. For those employed, as Ms. Durkin is currently, the recidivism rate is 12.7%; for those with a high school diploma the recidivism rate is lower than the rate for those who have some college, 10.6% to 13.9%. This chart also shows that those who are similarly situated as Ms. Durkin who are separated with a recidivism rate of 12.9% and those who do not use illicit drugs with a recidivism rate of 10.8% as compared to those who do use drugs at 21.9%.[7] Finally, further research in this report shows that the recidivism rate for those who have a CHC I and offense level of 22 – 25 have a recidivism rate of 13.3% as compared to those who have an offense level of 26-30 who recidivate at a rate of 18.9%. And those who have as the primary sentencing guideline

---

[6]The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_Hertory.pdf. at page 28.

[7] *Id.* at page 29.

7

as Ms. Durkin, drug trafficking, have a recidivism rate of 16.7% as compared to those who have a primary sentencing guideline of robbery at 33.7%.[8]

The United States Sentencing Commissions Report on *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), also supports Ms. Durkin's request for a lesser sentence. The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate, at age of release, is highest among offenders younger than twenty-one, at 48.5%, and those between the ages of twenty-one to twenty-four years old at 48.4% and declined in each subsequent age grouping, with those who are between 30 and 34 years old at time of release being at 36%. Figure 15 of the report shows that the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6) and declined in each subsequent age group, with those between the ages of 30 to 34 years old at 27.7%. Figure 25 compares the rearrest rate for federal and state offenders by age at release. In the 30-34 age grouping federal offenders were rearrested at a rate of 50.3% while state offenders were rearrested at a rate of 77%.[9] The report also shows that time to reincarceration expands with age and severity of reincarceration offense declined with age.[10]

Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See*

---

[8] *Id*. Exhibit 11 can be found on pg. 30.

[9] *Id*. at page 27

[10] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders , at page 23.

*United States v. Carr*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime.  A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law.  There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist.").  A review of sentences imposed in other cases involving similar circumstances suggests that a sentence within the advisory guideline range here would be unduly punitive and result in unwarranted disparity. Defendants convicted in this district of similar offenses have received sentences significantly below the advisory guidelines, including, where appropriate, sentences of probation or time served.

In *United States v. Trista Renee Levelle*, Case No. 17-20416-Altonaga, Ms. Levelle pleaded guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine. (DE 40). Ms. Levelle carried a suitcase with 1.945 kilograms of cocaine into the airport. (DE 40). The guidelines were 24 to 30 months. (DE 40). The Court sentenced Ms. Levelle to time served. (DE 43).

In *United States v. Jaime Lemos*, Case No. 13-20088-Cooke, Mr. Lemos pleaded guilty to conspiracy to possess MDMC (an amphetamine that can be known as "molly" or "bath salts") after his neighbor, arrested and sentenced in a separate case, told law enforcement that the drug-dependent Mr. Lemos would sell MDMC to a confidential source. (DE 73). Based on numerous controlled sales (and credit for safety valve and acceptance of responsibility), Mr. Lemos's total offense level was 21, yielding a

guideline range of 37 to 46 months. The Court sentenced Mr. Lemos to time served. (DE 84).

In *United States v. Sonya Raquel Robleto*, Case No. 20-20159-Cooke, Ms. Robleto pleaded guilty to importation of MDMA (also known as "ecstasy"). Her total offense level was 19, yielding guidelines of 30 to 37 months. The Court sentenced Ms. Robleto to 5 years' probation. (DE 37).

In *United States v. Ivan Antonio Pujols Matias*, Case No. 19-20466-Scola, Mr. Matias pleaded guilty to possession with intent to distribute oxycodone. (DE 14, 15). Mr. Matias sold 370 oxycodone 40 mg pills to an undercover DEA agent in exchange for $5,550. (DE 15). The Court sentenced Mr. Matias to two years' probation. (DE 18).

In *United States v. Hugh Tolden*, Case No. 22-20261-Gayles, Mr. Holden pleaded guilty to distribution of 50 or more grams of methamphetamine. (DE 32). His total offense level was 27, and his guidelines were 70 to 87 months. (DE 32). The Court sentenced Mr. Tolden to three years' probation. (DE 41).

In *United States v. De'Vante Moss*, Case No. 22-80130-Middlebrooks, Mr. Moss pleaded guilty to distribution of fentanyl. (DE 25). He sold MDMA (13 grams) and fentanyl (3 grams) to undercover agents. (DE 18). The investigation was initiated after the over-dose death of a customer of Mr. Moss's. (DE 21). Mr. Moss was arrested after a second coordinated sale with agents. After arrest, a gun was found in his vehicle. *Id*. Post *Miranda*, Mr. Moss admitted that he did not have any drugs on him for that sale because he planned to steal the agent's money by "flash[ing] the firearm." *Id*. His total offense level was 13 and his guidelines were 12 to 18 months. *Id*. The Court sentenced him to two years' probation with the condition that he complete a

six-month inpatient drug treatment program followed by one year of home detention with electronic monitoring. (DE 25).

### b. Ms. Durkin's History and Characteristics in Considering Her Sentence.

Ms. Durkin's history is part of the statutorily required considerations this Court must consider in the sentencing determination. 18 U.S.C. § 3553(a)(1). There was a time, of course, when district courts were limited in their ability to rely upon circumstances such as age, family considerations, and 'medical conditions in arriving at a sentence. That, though, is no longer the case, and sentencing courts are required to consider such factors:

> The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual 5H1.1-6, 11, and 12 (Nov. 2006). n3. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.*, 18 U.S.C. § 3553(a)(1). *Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring).

This Court, in arriving at the sentencing decision in this case, must, of course, consult the United States Sentencing Guidelines as the starting point in any sentencing determination. *See e.g. United States v. Henderson*, 724 Fed. Appx. 851, 856 (11th Cir. 2018) (The Supreme Court has made clear that the federal Guidelines are the sentencing court's "starting point and … initial benchmark."). Nonetheless, courts must also consider the other factors set out in § 3553(a). Indeed, in some instances, the guidelines may have little persuasive force in light of some of the other § 3553(a) factors, as one district judge has already observed:

11

> the remedial majority in Booker direct[s] courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, her education and vocational skills, her mental and emotional condition, her physical condition including drug or alcohol dependence, her employment record, her family ties and responsibilities, her socio-economic status, her civic and military contributions, and her lack of guidance as a youth. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluates the "history and characteristics" of the defendant.

*United States v. Glover*, 431 F.3d 744, 752 (11th Cir. 2005) quoting *United States v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D.Wis.2005) (citations omitted).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases, are now potentially relevant in every case. *United States v. Rodriguez*, 406 F.3d 1261, 1286-89 (11th Cir. 2005). One of those mitigating circumstances that was once barred from consideration, the loss of Ms. Durkin's parenting of her children, should be considered when this Court considers her sentence.

The Honorable Patricia M. Wald is a retired judge for the United States Court of Appeals for the District of Columbia, who has received the Medal of Freedom from President Obama,[11] wrote an article that appeared in the Federal Sentencing Reporter about the role of parenting. She concluded the article with a paragraph

---

[11]There is a brief biography and mention of the award of the Medal of Freedom available at the White House web page at: http://www.whitehouse.gov/the-press-office/2013/08/08/president-obama-names-presidential-medal-freedom-recipients

critical of what was, then and sadly still is today, the limited consideration permitted by the Sentencing Commission of the importance of parenting:

> The perennial law and order debate that goes on nationally focuses on the rights of society first as the individual offender to justify higher sentences, abolition of parole and even the death penalty. That same concern for society militates towards a sentencing policy that attempts in a small subset of first offender, non-violent parent prisoner cases to consider the welfare of the children. Neither Congress nor the Sentencing Commission has yet come forth with a convincing rationale why parenting should not be a legitimate consideration in the sentencing of low-risk offenders. *It is ironic for a society whose leaders talk endlessly of family values to categorically deny the safe harbor of a parent to some of its most needy children* (emphasis added).

Patricia M. Wald, "*What About the Kids?*": *Parenting Issues in Sentencing*, 8 Fed. Sent. 137, 139 (Nov./Dec. 1995).

Now that the Guidelines are no longer mandatory, courts have been willing to heed Judge Wald's call to fashion sentences that take into account the defendants' role as a parent. *See, e.g., United States v. Rose*, 722 F.Supp.2d 1286, 1290 (M.D. Ala. 2010) ("Therefore, the court granted Rose a three-level departure based on loss of caretaking."); *United States v. DiMattina*, 885 F.Supp.2d 572, 582 (E.D.N.Y. 2012) (where the court considered, among other factors, that "DiMattina's family will suffer emotionally and financially from her absence during her long incarceration."); *U. S. v. Tilga*, 2012 WL 1192526 (D. NM, April 5, 2012), at *4 ("Third, any period of incarceration will place a burden on Tilga's children, who are home-schooled and have some health issues."). Ms. Durkin's continued role in parenting her children is an essential element in helping to raise strong, confident young men with bright futures. As with the defendant in *Tilga*, Ms. Durkin has a child with serious health issues and

the loss of her parenting of her children, and the effect that loss will have upon her children, is deserving of consideration in the sentence this court imposes.

Another factor that Ms. Durkin would like this court to consider in fashioning a sentence is her work history since her graduation from high school. As documented in the draft PSR, Ms. Durkin is a hard-working young woman who takes care of her family. Courts have recognized that employment history is a valid justification for a below-guideline sentence. *See, Kimbrough v. United States*, 552 U.S. 85, 110 (2007) ("…second, the [district] court considered Kimbrough's 'history and characteristics.' § 3553(a)1) . . . [noting] that Kimbrough had no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps and that he had a *steady history of employment"*) (emphasis added). As in *Kimbrough*, Ms. Durkin's work history, which only has a lapse due to her mental health diagnosis and attempts at getting it under control, coupled with other factors like her age, family support, and possible negative institutional experiences if incarcerated, are all valid reasons that justify a non-incarceration sentence for Ms. Durkin.

    c.    ***Ms. Durkin's Health in Considering her Sentence.***

When balancing the 3553(a) factors, the possible health consequences from incarceration and Ms. Durkin's age also cuts in favor of her request for a sentence of sixty-six months, with a period of supervised release to follow. Ms. Durkin, even though in relative fair health will still suffer from the stressors placed on the body because of incarceration. In an online article by the Prison Policy Initiative entitled,

Research Roundup: Incarceration can cause lasting damage to mental health, the article talks about the debilitating effects of incarceration:

> We often talk about the disturbingly high numbers of people with mental health disorders locked up in prisons and jails. But less attention is paid to the ways in which incarceration itself perpetuates this problem by creating and worsening symptoms of mental illness. Research shows that, while it varies from person to person, incarceration is linked to mood disorders including major depressive disorder and bipolar disorder.
>
> The carceral environment can be inherently damaging to mental health by removing people from society and eliminating meaning and purpose from their lives. On top of that, the appalling conditions common in prisons and jails — such as overcrowding, solitary confinement, and routine exposure to violence — can have further negative effects. Researchers have even theorized that incarceration can lead to "Post-Incarceration Syndrome," a syndrome similar to PTSD, meaning that even after serving their official sentences, many people continue to suffer the mental effects.[12]

The mental effect of incarceration is not the only possible health consequence of incarceration. Incarceration also takes a physical toll on a person's body. In a study in the Annual Review of Sociology[13] the authors documented a negative relationship between incarceration and a divers set of health conditions. For example, incarceration is associated with high levels of self-reported and the experience of incarceration (exposure) generally has a greater effect on health than the length of incarceration. Aside from general health conditions such as physical

---

[12] K.R. Quandt and Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, (2021), http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

[13] M. Massoglia and W.A. Pridemore, Incarceration and Health, 41 Annual Review of Sociology, 291-310 (2015), https://doi.org/10.1146/annurev-soc-073014-112326

functioning, studies in this area have considered various distinct conditions, including infectious disease, cardiovascular disease, and formerly incarcerated person have an elevated risk for these chronic health conditions compared with the general population.[14]

Ms. Durkin's mental health difficulties, especially in conjunction with some of the other stressors placed on the body because of incarceration can also justifiably enter this Court's sentencing decision. *See, e.g., United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (A defendant's age, her prior minimal criminal record, and her medical condition are all valid considerations at sentencing because they relate to the history and characteristics of the defendant); *United States v. Foster*, 2012 WL 2863252, *5(N.D. Ill. 2012) ("At her original sentencing hearing, the Court found Foster's health concerns and her desire to rehabilitate her life to be mitigating factors taken into account pursuant to Section 3553(a).").

### III. <u>Conclusion</u>

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Courts are charged by Congress, as well,

---

[14] *Id*.

to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

Ms. Durkin respectfully requests this Court to follow that tradition and impose a sentence of probation or in the alternative a sentence of time served with supervised release to follow with a year of house arrest. Ms. Durkin believes that this sentence is sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:   *s/Kafahni Nkrumah*
Kafahni Nkrumah
Assistant Federal Public Defender
Special Bar ID #A5502967
109 North Second Street
Fort Pierce, Florida 34950
Tel: 772-489-2123
E-Mail: Kafahni_Nkrumah@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on May 3, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/Kafahni Nkrumah*
Kafahni Nkrumah